UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PRECIOUS SCOTT,

                          Plaintiff,

            -against-

COMMISSIONER OF SOCIAL
SECURITY,

                          Defendant.

19cv01105 (DF)

**MEMORANDUM
AND ORDER**

**DEBRA FREEMAN, United States Magistrate Judge:**

In this action, which is before this Court on consent pursuant to 28 U.S.C. § 636(c),

plaintiff Precious Scott ("Plaintiff") seeks review of the final decision of Andrew M. Saul,

Commissioner of the Social Security Administration ("Defendant" or the "Commissioner"),

denying Plaintiff Supplemental Security Income ("SSI") under the Social Security Act (the

"Act") on the ground that, for the relevant period, Plaintiff's impairments did not constitute a

disability under the Act.  Currently before the Court is Plaintiff's motion, pursuant to Rule 12(c)

of the Federal Rules of Civil Procedure, for judgment on the pleadings reversing the

Commissioner's decision.  (Dkt. 17.)   Also before the Court is the Commissioner's cross-motion

for judgment on the pleadings affirming the Commissioner's decision.  (Dkt. 19.)

For the reasons set forth below, Plaintiff's motion is granted to the extent that it seeks

remand for further administrative proceedings, and Defendant's cross-motion is denied.

## BACKGROUND[1]

Plaintiff's application for SSI benefits was filed by her mother on April 30, 2015, when Plaintiff was 16 years old. (R. at 72-73.) Plaintiff's application alleged a disability onset date of May 15, 2014, when Plaintiff was 15 years old. (*Id.*) Plaintiff claimed to have the severe impairments of "learning disorder"[2] and "behavioral problems." (*Id.* at 72-73, 88.) While Plaintiff's application was still pending, she turned 18, on November 14, 2016. (*See id.* at 19, 73.) Plaintiff's claim was initially denied on June 10, 2015 (*id.* at 81-86), and on July 7, 2015, Plaintiff, then proceeding *pro se*, requested a hearing before an administrative law judge ("ALJ") (*id.* at 87-88).

On April 18, 2017, ALJ George Gaffaney held a very brief hearing (the "April 2017 Hearing"), at which Plaintiff's mother, Wanda Scott ("Ms. Scott"), was present, but Plaintiff was not, and no attorney appeared on Plaintiff's behalf. (*See id.* at 62-71.) At that hearing, ALJ Gaffaney engaged in very little substantive questioning, and instead recommended that, as Plaintiff was then 18 years old, another hearing be held with both Ms. Scott and Plaintiff available for testimony. (*See id.* at 67-71.) The ALJ also urged Ms. Scott to consider retaining

---

[1] The background facts set forth herein are taken from the Social Security Administration ("SSA") Administrative Record (Dkt. 14) (referred to herein as "R." or the "Record").

[2] A learning disorder is a broad term for various disorders that cause "an information-processing problem that prevents a person from learning a skill and using it effectively." Learning disorders commonly affect a child's abilities in "reading, written expression, math or nonverbal skills." *Learning Disorders: Know the Signs, How to Help*, Mayo Clinic, https://www.mayoclinic.org/healthy-lifestyle/childrens-health/in-depth/learning-disorders/art-20046105 (last visited Mar. 22, 2020).

an attorney to represent Plaintiff. (*Id.*) On October 10, 2017, another hearing was held (the "October 2017 Hearing"), at which both Plaintiff and Ms. Scott were present, and at which Plaintiff was represented by counsel. (*See id.* at 38-61.)

In a decision issued on February 22, 2018, the ALJ found that, although Plaintiff had the severe impairments of learning disorder, attention deficit hyperactivity disorder ("ADHD"),[3] and oppositional defiant disorder ("ODD"),[4] Plaintiff's impairments were not severe enough to qualify her as disabled under the Act. (*Id.* at 15-33.) On December 10, 2018, the Appeals Council denied Plaintiff's request for review. (*Id.* at 1-5.) Thereafter, the ALJ's decision became the final decision of the Commissioner.

## A. Plaintiff's Personal and Employment History

Plaintiff was born on November 14, 1998 and was considered an "adolescent," within the meaning of the relevant Social Security regulations, at the time her application for benefits was filed. (*See id.* at 19, 73.) As stated above, Plaintiff reached the age of 18 on November 14, 2016, while her application was still pending. (*See id.*) At the October 2017 Hearing, Plaintiff testified that she lived with her mother and her 17-year-old sister. (*Id.* at 43-44.) She also testified that, although she had been in high school for four years, she was then in the 11th grade. (*Id.* at 44-46.)

---

[3] ADHD is a neurodevelopmental disorder that is characterized by "trouble paying attention, controlling impulsive behaviors . . . , or be overly active." Children with ADHD may "make careless mistakes or take unnecessary risks," "have difficulty getting along with others," and have other similar difficulties. *See What Is ADHD?*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/ncbddd/adhd/facts.html (last visited Mar. 22, 2020).

[4] ODD is a childhood behavioral disorder characterized by "a frequent and persistent pattern of anger, irritability, arguing, defiance or vindictiveness toward [parents] and other authority figures." *Oppositional Defiant Disorder (ODD)*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/oppositional-defiant-disorder/symptoms-causes/syc-20375831 (last visited Mar. 22, 2020).

### B.    Period Under Review

The relevant period under review for the purpose of SSI benefits runs from April 30, 2015, the date on which Plaintiff applied for benefits, until February 22, 2018, the date of the ALJ's decision.  20 C.F.R. §§ 416.330, 416.335; *Barrie on behalf of F.T. v. Berryhill*, No. 16cv5150 (CS) (JCM), 2017 WL 2560013, at *2 (S.D.N.Y. June 12, 2017) (adopting report and recommendation).

### C.    Relevant Evidence

The evidence in this case in large part is drawn from non-medical sources – primarily, records from Plaintiff's school, including Individual Education Plans ("IEPs")[5] created for Plaintiff, academic and disciplinary records, and the opinions of some of Plaintiff's teachers. There is also some medical evidence in the Record, including the opinion of consultative examiner Dr. Lucy Kim, and a Medical Source Statement signed by both social worker Paula Singer ("Singer") and treating psychiatrist Dr. Myreille Polycarpe.  Although Plaintiff's educational records are important to determining whether she was disabled during the relevant period, the Court's holding herein is based almost exclusively on the ALJ's failure to consider potentially dispositive *medical* evidence.  (*See* Discussion, *infra*, at Section III.)  Accordingly, although Plaintiff's school records are voluminous, the Court's summary of those records below will be relatively brief; rather than summarizing each piece of evidence in detail, the Court will largely describe, in more general terms, the major characteristics of – or seeming trends in – Plaintiff's behavior at school that are evident from the available records.

---

[5] An IEP is an individualized program for a disabled child that guides the structure and content of the child's special-education curriculum, and specifies the individual services the child will receive from his or her school.  *See generally A Guide to the Individualized Education Program*, U.S. Dep't of Educ., https://www2.ed.gov/parents/needs/speced/iepguide/index.html (last visited Mar. 22, 2020).

1. **School Records**

The Record contains IEPs from May 14, 2014 (R. at 190-96, 280-93), November 5, 2014 (*id.* at 295-311), October 27, 2016 (*id.* at 313-28).[6] The IEPs contain lengthy narrative comments describing Plaintiff's "present levels of performance and individual needs." (*See, e.g.*, *id.* at 280-82.) Plaintiff's IEPs consistently reported that Plaintiff was performing well below her grade level and pointed to various likely reasons for this. (*See id.* at 280, 295, 314.) The May 2014 IEP stated that Plaintiff "ha[d] a difficult time focusing and staying engaged in lessons which [could] result in her pulling other students off task, resulting in arguments and confrontations." (*Id.* at 280.) The narrative comments also highlighted Plaintiff's inconsistent level of effort, her difficulty completing tasks, and her poor attendance. (*Id.*) Likewise, the November 2014 IEP pointed to Plaintiff's frequent confrontations with adults, her failure to apply herself consistently, and her apparent difficulty staying seated in class and focusing on the tasks at hand. (*See id.* at 296-97.) In 2016, Plaintiff's IEP noted that she had "improved in her ability to regulate her mood and emotional expression," but that she still "struggle[d] with seeing how short-term actions [would] affect her in the long term." (*Id.* at 315.)

Several other educational assessments in the Record mirror the IEPs with respect to Plaintiff's reported behavioral patterns. Defendant's brief accurately summarizes a September 2014 psychoeducational evaluation by a school psychologist, a June 2015 evaluation by a school counselor, and a May 2017 letter from the head of special education at Plaintiff's school. (Def.

---

[6] There are no IEPs from 2015 or 2017, and neither party explains why this is the case. (*See* Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings, dated Sept. 17, 2019 ("Def. Mem.") (Dkt. 20), at 5-6, 10-11; Memorandum of Law in Support of the Plaintiff's Motion for Judgment on the Pleadings, dated July 15, 2019 ("Pl. Mem.") (Dkt.18), at 7-9.)

Mem., at 12-13.)  Each of these assessments highlight, for the covered periods of time, Plaintiff's low frustration tolerance, frequent outbursts, and difficulty completing tasks.  (*See id.*)

A more detailed assessment of Plaintiff's abilities and impairments with respect to her education is contained in a "Teacher's Questionnaire" completed at the request of the SSA by Patricia Hatzis ("Hatzis"), a special education teacher who knew Plaintiff well, having been one of her teachers for four years.  (*See* R. at 271-79.)  Hatzis opined that Plaintiff had limitations in the domains of:  acquiring and using information; attending and completing tasks; interacting and relating with others; and caring for herself.  (*See id.* at 273-77.)   Within these domains, Hatzis, by way of a check-box form, described the extent of Plaintiff's difficulty with particular activities or tasks.  (*Id.*)  For example, in the domain of "attending and completing tasks," Hatzis rated Plaintiff as having a "very serious problem" with "[f]ocusing long enough to finish [an] assigned activity or task" and "[w]orking at [a] reasonable pace/finishing on time."  (*Id.* at 274.) In fact, Hatzis opined that Plaintiff had a "serious problem" or a "very serious problem" in all but three of the 13 activities described in this domain.  (*Id.*)  Hatzis's descriptions of Plaintiff's problems in the other domains were less extreme, but she nevertheless noted a significant number of "serious" or "very serious" issues in those domains as well.  (*See id.* at 273, 275, 277.) In her narrative description of Plaintiff's functional capacity, Hatzis expressed, *inter alia*, that Plaintiff seemed to have "given up on herself and found it hopeless to attend [class]."  (*See id.* at 272.)

### 2.  Medical Records

#### a.  Treatment at Montefiore by Singer and Dr. Polycarpe

Plaintiff was treated at Montefiore Behavioral Health Center ("Montefiore") by Singer and Dr. Polycarpe from January 2016 until September 2017.  (*See id.* at 402-506.)  This was the

only medical or therapeutic treatment Plaintiff received for her impairments during the relevant period.  (*See generally* Background, *infra*, at Section D.)  Plaintiff saw Singer 19 times, often twice each month, and saw Dr. Polycarpe nine times in the course of her treatment.  (*See* R. at 402-506.)  At her initial evaluation on January 22, 2016, Plaintiff was diagnosed with ADHD and ODD.  (*See id.* at 406, 415.)

Singer's progress notes from each of Plaintiff's appointments describe behavioral problems similar to those described in the education records summarized above.  Singer often noted that Plaintiff "[got] very angry," making it difficult for her to make good decisions, that her mood was susceptible to certain "triggers," and that her engagement with Singer's therapy was inconsistent.  (*See, e.g.*, *id.* at 417, 425, 427, 450.)  In addition to making these narrative comments, Singer also conducted a mental status examination at each of Plaintiff's visits.  In general, Plaintiff's appearance, attitude, speech, thought process, thought content, cognition, orientation, and memory were normal, and, with respect to these areas, the results of Plaintiff's mental status exams changed little over the course of her treatment.  (*See, e.g.*, *id.* at 414, 438-39, 463, 480-81, 494-95.)  In contrast, reports of Plaintiff's mood, attention, insight, judgment, and impulse control varied, suggesting problematic or impaired areas of functioning.  For example, Plaintiff's mood was variously described as "euthymic[7] and angry," "calm," "anxious," "calm and irritable," and "tired."  (*See id.*)  Plaintiff's impulse control was typically rated as "fair" (*see, e.g.*, *id.*), but sometimes Singer described it as poor (*see, e.g.*, *id.* at 430, 442, 470).  Her attention was usually found to be impaired.  (*See, e.g.*, *id.* at 414, 438-39, 463, 480-81, 494-95.)

---

[7] Euthymia "often is used to refer to a state in patients with a bipolar disorder that is neither manic nor depressive but in between, associated with adaptive behavior and enhanced functioning."  *Euthymia,* APA DICTIONARY OF PSYCHOL., https://www.dictionary.apa.org/euthymia (last visited Sept. 23, 2019).

Dr. Polycarpe's progress notes and mental status findings were mostly consistent with Singer's. (*See id.* at 431-36, 440-43, 447-50, 457-61, 467-71, 475-78, 485-92, 500-03.) Upon conducting mental status exams, Dr. Polycarpe usually found that Plaintiff's attention and concentration were impaired, and that her insight, judgment, and impulse control were poor. (*See id.*) Dr. Polycarpe frequently noted symptoms of Plaintiff's impairments, including "mood swings, irritability, easily frustrated, often in a bad mood, disrespectful . . . [i]mpulsive" (*see id.* at 468), and at times described Plaintiff's ADHD as "uncontrolled" (*see, e.g.*, *id.* at 447). Dr. Polycarpe started Plaintiff on Concerta[8] 18 mg on May 23, 2016 (*id.* at 443), and, after it was noted that Plaintiff tolerated the medication well (*id.* at 447), Dr. Polycarpe increased the dose to 36 mg (*id.* at 449). Plaintiff several times had to be restarted on the medication after missing an appointment at which Dr. Polycarpe would have prescribed a refill. (*See, e.g.*, *id.* at 460, 470.) In general, Plaintiff appears to have had mixed success with Concerta as a treatment. In February 2017, for instance, she complained to Dr. Polycarpe that the medication was not working, and Dr. Polycarpe increased the dose again to 54 mg. (*Id.* at 475-77.) That dose was continued over several visits, and, in May 2017, Dr. Polycarpe later added Seroquel[9] 25 mg to Plaintiff's medication regime, apparently in an effort to treat a "moderate mood disorder" diagnosed at that appointment. (*See id.* at 491.)

---

[8] Concerta is the brand name for the drug methylphenidate. Methylphenidate "works by changing the amounts of certain natural substances in the brain" and is used to control the symptoms of ADHD. *Methylphenidate*, MEDLINEPLUS, https://medlineplus.gov/druginfo/meds/a682188.html (last visited Mar. 22, 2020).

[9] Seroquel is the brand name for the drug quetiapine. Quetiapine belongs to a class of drugs called atypical antipsychotics and is used to treat, *inter alia*, "episodes of mania (frenzied, abnormally excited or irritated mood) or depression in patients with bipolar disorder." *Quetiapine*, MEDLINEPLUS, https://medlineplus.gov/druginfo/meds/a698019.html (last visited Sept. 28, 2019).

In June 2017, at the request of the SSA, Singer filled out a Medical Source Statement that was co-signed by Dr. Polycarpe. (*Id.* at 399-402.) Among other things, the SSA form asked Singer and Dr. Polycarpe to opine on the extent to which Plaintiff's "ability to understand, remember, and carry out instructions" and her "ability to respond appropriately to supervision, co-workers, and work pressure in a work-setting" were affected by her impairments. (*See id.* at 401.) Like the Teacher's Questionnaire completed by Hatzis (*see* Background, *supra*, at Section C(1)), the Medical Source Statement listed various tasks or situations pertaining to each of these domains, and Singer checked boxes indicating that Plaintiff had a mild, moderate, marked, or extreme loss in each area resulting from her mental impairments. (R. at 401.) In the first domain (the "ability to understand," etc.), Singer opined that Plaintiff suffered a marked loss in her ability to: "[u]nderstand and remember detailed instructions"; "[c]arry out detailed instructions"; "[m]aintain regular attendance and be punctual"; "[d]eal with stress or semi-skilled and skilled work"; "[c]omplete a normal workday or work week without interruptions"; and "[p]erform at a consistent pace" without breaks. (*Id.*) In the second domain (the "ability to respond appropriately to supervision," etc.), Singer opined that Plaintiff had a marked loss in her ability to "[a]ccept instructions and respond appropriately to criticism"; "[g]et along with coworkers and peers"; and "[m]aintain socially appropriate behavior." (*Id.*) Singer also checked a box indicating that Plaintiff's impairments resulted in an extreme loss in her ability to "[s]et realistic goals or make plans independently of others." (*Id.*)

Although it is clear from the Record that Singer filled out the Medical Source Statement, it is also evident that Dr. Polycarpe reviewed and co-signed it. In Dr. Polycarpe's treatment notes from July 11, 2017, she indicated that Plaintiff's mother had brought in the form, which had been "filled [out] by therapist," for Dr. Polycarpe's review, and that Dr. Polycarpe had

co-signed it during that appointment.  (*Id.* at 502.)  On the final page of the Medical Source

Statement itself, Dr. Polycarpe not only signed the form, but also clarified something that Singer

had written in response to one of the questions on the form.  (*See id.* at 402.)

### b.     Consultative Psychiatric Examination by Dr. Kim

On June 6, 2015, Plaintiff was examined by Dr. Kim at the request of the SSA.  (*See id.*

at 362-66.)  Plaintiff reported her history of behavior problems to Dr. Kim and noted the issue of

her frequently losing her temper and concentration.  (*Id.* at 363.)  The results of a mental status

examination conducted by Dr. Kim were mostly normal.  (*See id.* at 364-65.)  Among other

things, Dr. Kim found that Plaintiff's mood was euthymic, her attention and concentration were

intact, her memory was mildly impaired, and her insight and judgment were "[a]ge appropriate."

(*Id.*)  Dr. Kim opined that Plaintiff had a moderate limitation in her ability to "interact[]

adequately with peers and adults," but no had other limitations.  (*Id.* at 365.)  Dr. Kim explicitly

ruled out limitations in a host of areas, including "[a]ttending to, following, and understanding

age-appropriate directions[ and] completing age-appropriate tasks."  (*Id.*)  Dr. Kim diagnosed

Plaintiff with "learning disorder" and made a note to rule out ODD.  (*Id.*)   Dr. Kim concluded

that, overall, Plaintiff's impairments were not "significant enough to interfere with [her] ability

to function on a daily basis."  (*Id.*)

### D.     Plaintiff's and Her Mother's Testimony Before the ALJ

At the October 2017 Hearing, the ALJ first briefly questioned Plaintiff, and she testified

that she was then in the 11th grade, and that she lived with her mother and her sister.  (*Id.*

at  43-44.)  Following this testimony, the ALJ turned the examination over to Plaintiff's attorney,

who asked the remainder – and vast majority – of the questions during the hearing.  (*See id.*

at  44-57.)  When asked what she found difficult about school, Plaintiff testified that she had

issues "[with] [r]eading and [with her] attitude and like trying to solve problems like with situations with like teachers and students." (*Id.* at 45-46.)  Plaintiff also testified that she had similar difficulties getting along with her sister and her mother while at home.  (*Id.* at 52.) When asked whether she received any special assistance at school, Plaintiff testified that she had "two teachers in the classroom" (a teacher and the teacher's assistant), and that she had been receiving this type of extra help for several years, "since at least middle school."  (*Id.* at 46.)

Plaintiff was also asked about the treatment she had been receiving at Montefiore from Singer and Dr. Polycarpe.  Plaintiff described her treatment as aiming to "help [her] with [her] attitude and . . . [help her to] cope with people better." (*Id.* at 48.)  Plaintiff testified that she had been seeing both Singer and Dr. Polycarpe for "[a] couple [of] years," and that Dr. Polycarpe had prescribed Plaintiff medication to "help [her] calm down" and to address her ADHD. (*Id.* at 49-50.)  As relevant to Plaintiff's ADHD, Plaintiff's attorney asked her how, "in general," she "[found] her attention span to be," and whether she would characterize it as "[g]ood" or "bad." (*Id.* at 50.)  To that question, Plaintiff responded, "Okay.  Not too well.  Like, I get distracted a lot and when I need help and the teacher can't help me, I usually get upset and leave." (*Id.*)

After examining Plaintiff on these topics, Plaintiff's attorney took testimony from Ms. Scott.  Ms. Scott explained that she sought psychiatric treatment for her daughter at Montefiore because of Plaintiff's serious behavior problems at school – her constantly fighting with teachers and other students, her poor academic performance, and her inability to focus and complete tasks, often manifesting in her simply leaving the classroom.  (*See id.* at 52-53.)  In describing Plaintiff's treatment at Montefiore, Ms. Scott noted that Dr. Polycarpe was regularly "going up higher" and increasing the strength of Plaintiff's medications.  (*Id.* at 53.)  Ms. Scott also stated that "[t]hey," presumably someone at Montefiore, had "sent the school letters telling

[educators] to let [Plaintiff] get out [of] her seat and leave the classroom sometimes to let her come back around[] [and] refocus herself," but that this attempted mitigation had not been effective, causing Dr. Polycarpe to "up the medicine, the milligrams, higher to see how [Plaintiff] could cope with it." (*Id.* at 53-54.) Ms. Scott also relayed Dr. Polycarpe's intention to "increase [the dosage] more now because [Plaintiff is] . . . [an] adult." (*Id.* at 54.) In general, Ms. Scott testified to her view that the medication Dr. Polycarpe had been prescribing was not producing a noticeable change in Plaintiff's behavior. (*Id.* at 55.)

When asked about Plaintiff's home life, Ms. Scott was seemingly most animated in responding to a question regarding whether Plaintiff "[was] able to get herself ready for school." (*See id.*) In her answer, Ms. Scott twice said "[o]h my god," and described how it typically took Plaintiff "almost two to three hours" to get ready, resulting in her "always [being] late for school," "very late, all the time." (*Id.*) According to Ms. Scott, Plaintiff was "always shutting down on [her]," to the point that it was difficult for Ms. Scott (or anyone) to communicate effectively with Plaintiff and motivate her to focus on getting ready for school. (*See id.*)

The ALJ did not conduct any further examination of Plaintiff or Ms. Scott after each had testified in response to questions by Plaintiff's attorney.

###### E. The VEs' Testimony Before the ALJ

The ALJ examined two VEs, one at the April 2017 Hearing – VE Suman Srinivasan ("Srinivasan") (*see id.* at 64-66) and another at the October 2017 Hearing – VE Mia Heikkila ("Heikkila") (*see id.* at 57-60). In both instances, the ALJ's questioning was very brief, and the questions he posed at the two hearings were substantively quite similar. At the April 2017 Hearing, the ALJ asked Srinivasan to consider the employability of an 18-year-old with Plaintiff's education and work experience who was limited to unskilled work consisting of

"simple, routine [tasks] with occasional change[s] in a routine work setting." (*Id.* at 64-65.)

Srinivasan responded that there were at least two jobs – those of a packager and a store clerk –

that the hypothetical individual could perform. (*Id.* at 65-66.) The ALJ's second hypothetical

asked Srinivasan to opine as to whether the same individual could do those or other jobs if she

would miss three days of work each month. (*Id.* at 66.) Srinivasan responded that no jobs would

be available to the individual in that case. (*Id.*)

At the October 2017 Hearing, in a hypothetical posed to Heikkila, the ALJ again

described an individual limited to simple, routine tasks, but added that the individual was also

limited to "only occasional interaction with [the] public, co-workers, and [her] supervisor." (*Id.*

at 58-59.) Heikkila gave examples of three jobs that the hypothetical individual could perform –

namely, industrial cleaner, laundry worker, and small-parts assembler. (*Id.* at 59.) In a further

hypothetical, the ALJ added that the individual described would miss two days of work each

month. Heikkila testified that this limitation would be "work preclusive." (*Id.*) Similarly, in

response to two hypotheticals posed by Plaintiff's attorney, Heikkila testified that the individual

would not be able to work, if she were unable to have any contact with coworkers and

supervisors or would be "off task 25% of the time." (*Id.* at 59-60.)

F.    <u>**The Current Action and the Motions Before the Court**</u>

Plaintiff, through counsel, filed a Complaint in this action on February 5, 2019. (*See*

Complaint, dated Feb. 5, 2019 ("Compl.") (Dkt. 1).) On July 15, 2019, Plaintiff filed a motion

for judgment on the pleadings (Dkt. 17), together with a supporting memorandum of law (Pl.

Mem.) On September 17, 2019, Defendant filed a cross-motion for judgment on the pleadings

in favor of the Commissioner (Dkt. 19), supported by a memorandum of law (Def. Mem.).

Plaintiff did not file a reply.

## DISCUSSION

## I.     APPLICABLE LEGAL STANDARDS

### A.     Judgment on the Pleadings

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id.* (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final, provided that the correct legal standards are applied and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  "[W]here an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted)).  Thus, the first step is to ensure that the Commissioner applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  In making

this determination, a court must consider the underlying record.  The reviewing court does not,

however, decide *de novo* whether a claimant is disabled.  *See Veino v. Barnhart*, 312 F.3d 578,

586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported

by evidence having rational probative force, we will not substitute our judgment for that of the

Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*,

104 F.3d 1432, 1433 (2d Cir. 1997).  Thus, if the correct legal principles have been applied, the

Court must uphold the Commissioner's decision upon a finding of substantial evidence, even

where contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)

("Where there is substantial evidence to support either position, the determination is one to be

made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir.

1998) (affirming decision where substantial evidence supported both sides).

### B.       Standard for Determining Disability in a Child

A child is disabled under the Act if he or she:

> [1]      has a medically determinable physical or mental
>          impairment,
>
> [2]      which results in marked and severe functional limitations,
>          and
>
> [3]      which can be expected to result in death or which has lasted
>          or can be expected to last for a continuous period of not
>          less than 12 months . . .
>
> [although] no individual under the age of 18 who engages in
> substantial gainful activity . . . may be considered to be disabled.

42 U.S.C. § 1382c(a)(3)(C)(i)-(ii); *see* 20 C.F.R. § 416.906; *see also Encarnacion ex rel. v.*

*Astrue*, 568 F.3d 72, 75 (2d Cir. 2009).  The Commissioner's regulations set forth a three-step

sequential evaluation process to determine whether an individual under age 18 is disabled within

the meaning of the Act.  20 C.F.R. § 416.924(a).  At the first step, the ALJ must determine

whether the claimant is engaged in substantial gainful activity. *Id.* §§ 416.924(a), (b). If so, the child is not under a disability. *Id.* If not, the analysis proceeds to step two, where the ALJ must determine whether the child has a severe medically determinable impairment. *Id.* §§ 416.924(a), (c). If the child's impairment constitutes only "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations," the child will not be found to be disabled. *Id.* § 416.924(c).

If the claimant satisfies step two, the analysis proceeds to the final step, which requires the ALJ to determine whether the claimant's impairment(s) meets, medically equals, or functionally equals the criteria of an impairment found in 20 C.F.R. Pt. 404, Subpt. P, App'x 1 (the "Listings"). *Id.* §§ 416.924(a), (d). An impairment "functionally equal[s]" the Listings if it results in either a "'marked' limitation" in two of six defined domains of functioning, or an "'extreme' limitation" in one domain of functioning. *Id.* § 416.926a(a). The six domains of functioning are: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and, (vi) overall health and physical well-being. *Id.* §§ 416.926a(b)(1)(i)-(vi). When making a finding with regard to functional equivalence, an ALJ must "assess the interactive and cumulative effects of all of the impairments for which [there is] evidence, including any impairments" that are not "severe." *Id.* § 416.926a(a).

Under the regulations, a "marked limitation" is defined as one that is "'more than moderate,' but 'less than extreme,' and 'seriously' interferes with a claimant's ability to independently initiate, sustain, or complete activities." *Marizan ex rel. A.O. v. Colvin*, No. 13cv3428 (VEC) (FM), 2014 WL 3905911, at *8 (S.D.N.Y. Aug. 11, 2014) (quoting 20 C.F.R. § 416.926a(e)(2)). An "extreme limitation" is defined as one that "'very seriously'

interfere[s] with a claimant's ability to initiate, sustain, or complete activities independently," and although it is "not necessarily indicative of a total loss of functioning, an 'extreme' rating is given to only the 'worst limitations.'"  *Id.* (quoting 20 C.F.R. § 416.926a(e)(3)).

### C.  Standard for Determining Disability in an Adult

With respect to claimants over the age of 18, to be entitled to disability benefits under the Act, a claimant must establish his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  An individual is considered to be under a disability only if the individual's physical or mental impairments are of such severity that he or she is not only unable to do his or her previous work, but also cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

In evaluating an adult disability claim, an ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R. § 416.920; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam).  Throughout the inquiry, the ALJ must consider four primary sources of evidence:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(i).  If not, at the second step, the ALJ determines whether the claimant has a "severe" impairment or combination of

impairments that significantly limits his or her physical or mental ability to do basic work activities.  *Id.* §§ 416.920(a)(4)(ii), (c).  If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an impairment in the Listings.  *Id.* § 416.920(a)(4)(iii).  If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience."  *Id.* § 416.920(d).

Where the plaintiff alleges a mental impairment, steps two and three require the ALJ to apply a "special technique," outlined in 20 C.F.R. § 416.920a, to determine the severity of the claimant's impairment at step two, and to determine whether the impairment satisfies Social Security regulations at step three.[10]  *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  If the claimant is found to have a "medically determinable mental impairment," then the ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)," and then "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of [Section 416.920a]," which specifies four broad functional areas:  (1) understanding, remembering, or applying information; (2) interacting with others; (3)  concentration , persistence, or pace; and (4) adapting or managing oneself. 20 C.F.R. §§ 416.920a(b), (c)(3).  Functional limitations in these areas are rated on a five-point scale of "[n]one, mild, moderate, marked, [or] extreme."  *Id.* § 416.920a(c)(4).

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the Record, the claimant's RFC, or ability

---

[10] Pursuant to 81 Fed. Reg. 66138-01 (S.S.A. Sept. 26, 2016), the SSA revised the criteria in the Listing of Impairments (20 C.F.R. Pt. 404, Subpt. P, App'x 1) used to evaluate claims involving mental disorders under Title II of the Act, effective January 17, 2017.  These revisions impacted various relevant portions of 20 C.F.R. § 416.

to perform physical and mental work activities on a sustained basis. *Id.* § 416.945. The ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past relevant work." *Id.* § 416.920(a)(4)(iv). Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether, in light the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy. *Id.* §§ 416.920(a)(4)(v), (g).

On the first four steps of the five-step evaluation, the claimant generally bears the burden of establishing facts to support his or her claim. *See Berry*, 675 F.2d at 467 (internal citation omitted). At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). The Commissioner must establish that the alternative work "exists in significant numbers" in the national economy and that the claimant can perform this work, given his or her RFC and vocational factors. 20 C.F.R. § 416.960(c)(2).

Where the claimant only suffers from exertional impairments, the Commissioner can satisfy this burden by referring to the Medical-Vocational Guidelines, set out in 20 C.F.R. Pt. 404, Subpt. P, App'x 2 (the "Guidelines"). Where, however, the claimant suffers non-exertional impairments, such as visual impairment, psychiatric impairment, or pain that "'significantly limit the range of work permitted by his [or her] exertional limitations,' the ALJ is required to consult with a vocational expert," rather than rely exclusively on these published guidelines. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986) (internal citations omitted)).

### D.     <u>The Treating Physician Rule</u>

Under the so-called "treating physician rule,"[11] the medical opinion of a treating source

as to "the nature and severity of [a claimant's] impairments" is entitled to "controlling weight,"

where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with other substantial evidence in [the] case record."

20 C.F.R. § 416.927(c)(2). "Treating source" is defined as the claimant's "own acceptable

medical source who . . . has provided [the claimant] with medical treatment or evaluation" and

who has had "an ongoing treatment relationship" with the claimant. *Id.* § 416.927(a)(2).

Treating physicians' opinions are generally accorded deference because treating physicians "are

likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a

claimant's condition and "bring a unique perspective to the medical evidence that cannot be

obtained from the objective medical findings alone or from reports of individual examinations,

such as consultative examinations." *Id.* § 416.927(c)(2); *see Selian v. Astrue*, 708 F.3d 409, 418

(2d Cir. 2013).

Where an ALJ determines that a treating physician's opinion is not entitled to

"controlling weight," the ALJ must "give good reasons" for the weight accorded to the opinion.

20 C.F.R. § 416.927(c). Failure to "give good reasons" is grounds for remand. *Halloran v.*

*Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the

Commissioner has not provided 'good reasons' for the weight given to a treating physician's

opinion . . . ."). Moreover, in determining the weight to be accorded to an opinion of a treating

physician, the ALJ "must apply a series of factors," *Aronis v. Barnhart*, No. 02cv7660 (SAS),

---

[11] In accordance with Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 11 (Jan. 18, 2017), the treating physician rule, as described herein, will no longer be in effect for applications made to the SSA on or after March 27, 2017.

2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citation omitted), including: (1) the length

of the treatment relationship and the frequency of examination; (2) the nature and extent of the

treatment relationship, including whether the treatment received was particular to the claimant's

impairment; (3) the supportability of the physician's opinion; (4) the consistency of the

physician's opinion with the record as a whole; and (5) the specialization of the physician

providing the opinion, 20 C.F.R. §§ 416.927(c)(2)-(5); *see Shaw*, 221 F.3d at 134 (noting that

these five factors "must be considered when the treating physician's opinion is not given

controlling weight"); *see also Daley v. Berryhill*, 16cv2246 (PGG) (JLC), 2017 WL 4236566, at

*1 (S.D.N.Y. Sept. 24, 2017) (discussing factors and citing *Halloran*, 362 F.3d at 32).

Even where a treating physician's opinion is not entitled to "controlling weight," it is

generally entitled to "more weight" than the opinions of non-treating and non-examining

sources. 20 C.F.R. § 416.927(c)(2); *see* SSR 96-2p, 1996 WL 374188 (S.S.A. July 2, 1996) ("In

many cases, a treating source's medical opinion will be entitled to the greatest weight and should

be adopted, even if it does not meet the test for controlling weight."); *see also Gonzalez v. Apfel*,

113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000).

Normally, a consultative physician's opinion is entitled to "limited weight." *Cruz v.*

*Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) (citations omitted). This is because consultative

examinations "are often brief, are generally performed without benefit or review of the

claimant's medical history, and, at best, only give a glimpse of the claimant on a single day. The

opinions of consultative physicians, though, "can constitute substantial evidence in support of the

ALJ's decision" when the opinion a claimant's treating physician cannot be obtained, or if no

physician who treated the claimant qualifies as a treating physician. *Sanchez v. Comm'r of Soc.*

*Sec.*, No. 15cv4914 (PGG) (JCF), 2016 WL 8469779, at *10 (S.D.N.Y. Aug. 2, 2016), *report and recommendation adopted*, 2017 WL 979056 (Mar. 13, 2017).

## II.     THE ALJ'S DECISION

On February 22, 2018, the ALJ issued his decision finding that Plaintiff was not disabled under the Act, either when she was a child or after she turned 18.  (R. at 15-33.)   In rendering his decision, the ALJ applied, for the relevant time frames, both the three-step sequential evaluation used for children, and the five-step sequential evaluation used for adults.  (*See id.*)

### A.     The Decision Regarding Plaintiff's Condition as a Child

#### 1.     The ALJ's Use of the Three-Step Sequential Evaluation

As an initial matter, the ALJ determined that Plaintiff was an "adolescent" on the date her application for benefits was filed.  (*Id.* at 19.)  In evaluating Plaintiff's eligibility for SSI benefits, the ALJ applied the three-step sequential evaluation for determining whether a child is disabled under the Act.  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the date her application was filed.  (*Id.*)  At Step Two, the ALJ found that Plaintiff had the severe impairments of a learning disorder, ADHD, and ODD.  (*Id.*)  At Step Three, the ALJ found that Plaintiff's impairments did not meet or medically equal the criteria set forth in the Listings, and then considered whether her impairments were functionally equivalent to a listed impairment, analyzing Plaintiff's limitations in the six relevant domains of functioning.  (*Id.* at 19-20.)   Finding that, although Plaintiff had a marked limitation in the domain of interacting and relating with others, she did not have more than a moderate limitation in any of the five other domains, the ALJ concluded that Plaintiff's impairments were not functionally equivalent to a listed impairment and that Plaintiff was not disabled under the Act prior to turning 18.  (*Id.* at 24-28.)

## 2. Weight Accorded to Opinion Evidence
## in Determining Functional Equivalence

In assessing whether Plaintiff met the standards for child disability, the ALJ reviewed the

educational and medical evidence in the Record and assigned varying amounts of weight to the

opinions of, among others, Dr. Kim, Singer, and Hatzis. (*See id.* at 20-24.) The ALJ assigned

"significant weight" to the opinion of Dr. Kim, reasoning that her opinion "align[ed] with the

preponderance of the evidence." (*See id.* at 22-23.) The ALJ purported to support this assertion

by citing several facts from one of Plaintiff's IEPs, none of which was clearly connected to any

particular aspect of Dr. Kim's opinion, and by then simply concluding, "[t]hus, the opinion is

given significant weight." (*See id.* at 23.) To the opinion of Hatzis, too, the ALJ assigned "great

weight." (*Id.* at 24.) The ALJ explained that Hatzis "speacialize[d] in special education" and

had known Plaintiff for four years. (*Id.*) Furthermore, in the ALJ's view, her opinion (expressed

in the "Teacher's Questionnaire") "generally align[ed] with the preponderance of record

evidence." (*Id.*)[12]

In addressing the Medical Source Statement completed by Singer and co-signed by

Dr. Polycarpe, the ALJ notably described the Statement only as representing the opinion of

Singer, and made no mention of Dr. Polycarpe in his analysis. (*See id.* at 23.) Discussing

Singer, the ALJ acknowledged that she "regularly saw [Plaintiff]," but asserted that "her opinion

[did] not completely align with the preponderance of evidence." (*Id.*) The ALJ then gave

examples from the Record apparently intended to demonstrate that Plaintiff functioned at a

higher level than described by Singer; examples such as the opinion of one educator that Plaintiff

---

[12] In the interest of focusing attention on the most relevant evidence, the Court has omitted, from its summary of the ALJ's decision, the ALJ's discussion of various other opinions in the Record that do not appear to have had a significant impact on his decision. (*See id.* at 22-23.)

"was able to work on the one-step scientific equation questions in class[] and [ ] was capable of understanding the science content . . . if she was present for the lesson" and another educator's comment that Plaintiff "liked to go up to the board and participate." (*Id.*) Ultimately, based on this evidence, the ALJ gave Singer's opinion only "some weight." (*Id.*)

### 3.  Analysis of Plaintiff's Limitations in the Six Domains

As to the relevant six domains of child functioning, the ALJ found that Plaintiff suffered from a marked limitation in the domain of interacting and relating with others, but that she had "less-than-marked" limitations in the domains of acquiring and using information, attending and completing tasks, and caring for oneself, and no limitations in the domains of moving about and manipulating objects, and health and physical well-being. (*Id.* at 24-28.) As only the domains in which the ALJ found that Plaintiff had some, but less-than-marked, limitations are in dispute (*see* Pl. Mem., at 17), the Court will focus on those.

The ALJ first considered Plaintiff's ability to acquire and use information. (R. at 24-25.) This domain "involves how well children perceive, think about, remember, and use information in all settings, which include daily activities at home, at school, and in the community." (*Id.* at 24 (citing 20 C.F.R. § 416.926a(g) and SSR 09-3p).) The ALJ found that Plaintiff had a less-than-marked limitation in acquiring and using information; as support for this conclusion, the ALJ cited, *inter alia*, Hatzis's opinion that Plaintiff "had not grown in her independence to do work," "refused to try on her own," and frequently "claim[ed] that she was not being helped enough." (*Id.* at 24-25.)

The ALJ then considered Plaintiff's limitations in attending and completing tasks, which entails consideration of "how well a child is able to focus and maintain attention, and how well she is able to begin, carry through, and finish activities, including the mental pace at which she

performs activities and the ease of changing activities. . . . [in addition to] a child's ability to avoid impulsive thinking." (*Id.* at 25 (citing 20 C.F.R. § 416.926a(h) and SSR 09-4p).)  In determining that Plaintiff had a less-than-marked limitation in this domain, the ALJ again cited evidence that Plaintiff "was able to work on the one-step scientific equation questions in class[] and [ ] was capable of understanding the science content . . . if she was present for the lesson" and that she "liked to go up to the board and participate." (*Id.*)

Finally, the ALJ weighed Plaintiff's limitations in carrying for herself, a domain involving "how well a child maintains a healthy emotional and physical state . . . includ[ing] how well the child copes with stress and changes in environment." (*Id.* at 26.)  Also relevant to this domain is a child's ability to "demonstrate consistent control over her behavior." (*Id.* at 27.) The ALJ initially acknowledged that Plaintiff had exhibited some problems in this area, as evidenced by Hatzis's report that Plaintiff often "could not contain her frustration" and that, "when angered[,] she took much longer than most to calm down," as well as Plaintiff's mother's testimony that Plaintiff took "2-3 hours to get ready for school." (*Id.*)  Nevertheless, the ALJ found that Plaintiff had a less-than-marked limitation in caring for herself and cited, as the sole piece of evidence in support of this finding, that "her behavior was the exact opposite [of that described by Hatzis] when she was asked to lead, teach, and choreograph a group for dance class." (*Id.*)

### B.     The Decision Regarding Plaintiff's Condition as an Adult

In determining that Plaintiff was not disabled at any time after she reached the age of 18 in November 2016, the ALJ found, at Step One of the prescribed five-step sequential evaluation, that Plaintiff had not engaged in any substantial gainful activity since she became an adult. (*See id.* at 19, 28.)  Proceeding to Step Two, the ALJ found that Plaintiff had not developed any new

severe impairments since becoming an adult, but that she continued to have the severe impairments she had as a child.  (*Id.* at 28.)

At Step Three, the ALJ determined that Plaintiff did not have an impairment that met or medically equaled the severity of an impairment in the Listings.  (*Id.* at 28-30.)  The ALJ specifically considered Sections 12.05 ("Intellectual disorder"), 12.08 ("Personality and impulse-control disorders"), and 12.11 ("Neurodevelopmental disorders") of 20 C.F.R. Pt. 404, Subpt. P., App'x 1.  (*Id.* at 28.)  In discussing each of these Sections, the ALJ employed the "special technique" for assessing mental impairments (*see* Discussion, *supra*, at Section I(C)) and determined that Plaintiff had no limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a mild limitation in concentrating, persisting, or maintaining pace; and no limitation in managing herself (*id.* at 29).  The ALJ also asserted, separately, that Plaintiff did not even meet the definition of the impairment described in Section 12.05.  (*See id.* at 29-30.)

Following this analysis, the ALJ proceeded to determine Plaintiff's RFC.  (*Id.* at 30-31.)  In that regard, the ALJ found that Plaintiff had the RFC to "perform a full range of work at all exertional levels[,] but with the following nonexertional limitations:  she [could] do simple, routine tasks with occasional change in a routine work setting and occasional interaction with the public, coworkers, and supervisors."  (*Id.* at 30.)   In supporting his RFC determination, the ALJ cited the mental status examinations of Plaintiff as an adult, describing them as producing "normal observations."  (*Id.* at 30-31.)  The ALJ also cited what he described as Plaintiff's "essentially routine appointments" with Singer and Dr. Polycarpe; the ALJ noted that, at these appointments, Plaintiff sometimes reported that medication seemed to be helping her focus,

although he also noted that Dr. Polycarpe had increased the dosage of that medication at least once.  (*See id.* at 31.)

Finally, as the ALJ found, based on Plaintiff's benefits application and testimony, that she had no past relevant work, the ALJ bypassed Step Four and proceeded to Step Five.  (*Id.* at 31-32.)  Based on the testimony of "the vocational expert" (it is not clear which one (*see* Background, *supra*, at Section E)) that jobs existed in the national economy for someone with Plaintiff's abilities and limitations (as formulated by the ALJ in his RFC determination), the ALJ concluded that Plaintiff was capable of working, and was therefore not disabled under the Act (R. at 32).

## III.    <u>REVIEW OF THE ALJ'S DECISION</u>

In her moving brief, Plaintiff contends that the ALJ erred in finding that she was not disabled, both before and after she turned 18.  (*See* Pl. Mem., at 16-27.)  As to the ALJ's analysis of Plaintiff's condition when she was a child, Plaintiff challenges the ALJ's finding that she had less-than-marked limitations in the domains of acquiring and using information, attending and completing tasks, and caring for oneself.  (*Id.*, at 17.)  The substance of Plaintiff's argument with respect to each domain is that "there was much more evidence that supported finding a marked limitation" that the ALJ failed to consider.  (*See id.*, at 18, 21, 25.)  With respect to the ALJ's decision that Plaintiff was not disabled after turning 18, Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence.  (*See id.*, at 26-27.)  In particular, Plaintiff contends that the ALJ ignored abundant evidence that Plaintiff would have difficulty maintaining a job without excessive absences (*id.*) – something that both VEs said would be "work preclusive" (*see* Background, *supra*, at Section E).  A key piece of evidence overlooked by the ALJ, Plaintiff argues, is the opinion of Singer regarding Plaintiff's problems with

attendance, pace, and concentration (Pl. Mem., at 26), an opinion which, as noted above, was also signed by Dr. Polycarpe.

In response, Defendant asserts that the ALJ's decision was supported by substantial evidence and, with respect to the period when Plaintiff was a minor, argues that, although Plaintiff's brief points to evidence potentially suggesting that Plaintiff suffered from a marked limitation in one or more domains, the ALJ appropriately weighed that evidence against other, conflicting evidence in reaching his decision. (*See* Def. Mem., at 15-22.) In this regard, Defendant relies heavily on the opinion of Dr. Kim and Plaintiff's school records (*id.*), but Defendant also argues that "[t]here is no merit Plaintiff's argument that the ALJ should have given more weight to Ms. Singer's questionnaire" (*id.*, at 22). In a footnote, Defendant concedes that the ALJ "did not expressly discuss Dr. Polycarpe's stamp on Ms. Singer's questionnaire," but argues that the form was clearly filled out by Singer and that, in any event, "the ALJ provided 'good reasons' for giving only some weight to Ms. Singer's opinion." (*Id.*, at 22 n.2.) With respect to the period when Plaintiff was an adult, Defendant again cites to Dr. Kim's opinion and dismisses Plaintiff's argument regarding her frequent absences, stating that "the fact that school records showed frequent tardiness and absences did not require the ALJ to find that Plaintiff's ADHD and [ODD] prevented her from maintaining regular attendance at work." (*Id.*, at 24-25.)

Upon review, the Court finds that the ALJ ignored the fact that Dr. Polycarpe, a treating physician, had rendered an opinion on Plaintiff's functional capacity, and failed to give that opinion controlling weight or to provide good reasons for not doing so. This error alone warrants remand. Furthermore, the ALJ's decision cannot be found to be supported by substantial evidence without proper consideration of Dr. Polycarpe's opinion.

### A.    The ALJ Failed To Apply the Treating Physician Rule.

Although Plaintiff does not explicitly argue that the ALJ failed to apply the treating physician rule,[13] the Court is tasked with determining whether the ALJ's decision "affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence." *Cichocki v. Astrue*, 729 F.3d 172 (2d Cir. 2013).  The ALJ failed to apply the treating physician rule in this case, and that failure to apply the proper standards ultimately precludes a finding that his decision was supported by substantial evidence.

### 1.    The Medical Source Statement Completed by Singer Also Represents the Opinion of Dr. Polycarpe.

As stated above, the Medical Source Statement completed by Singer was co-signed by Dr. Polycarpe, and Dr. Polycarpe's treatment notes indicate that she reviewed what Singer had written.  (*See* Background, *supra*, at Section C(2)(a).)  The ALJ, Defendant, and, to some extent, even Plaintiff, each generally refer to the Medical Source Statements as representing *Singer's* opinion, and thus any discussion of whether this opinion is entitled to controlling weight is largely absent from the ALJ's decision and the parties' briefs.

---

[13] Plaintiff arguably does raise this argument implicitly.  Throughout her brief, Plaintiff argues that the ALJ ignored the significant limitations assessed by Singer and Dr. Polycarpe in their Medical Source Statement.  (*See, e.g.*, Pl. Mem., at 19-21, 25-26.)  Furthermore, in arguing that the ALJ failed to account for Plaintiff's absenteeism in formulating her RFC, Plaintiff cites cases in which an ALJ failed to apply to treating physician rule (*see id.*, at 27), implying that the ALJ in this case should have given Singer and Dr. Polycarpe's opinion more weight.  This implication was apparent to Defendant, who directly addressed "Plaintiff's argument that the ALJ should have given more weight to Ms. Singer's questionnaire" and seemed to acknowledge the relevance of the treating physician rule by stating, in a footnote, that the ALJ gave "good reasons" for assigning only some weight to Singer's and Dr. Polycarpe's opinion.  (Def. Mem., at 22.)

This is error.  A report, questionnaire, or other such form that is co-signed by a treating physician is presumed to represent the opinion of that physician unless there is evidence to the contrary – regardless of who authored it.  *See Santiago v. Barnhart*, 441 F. Supp. 2d 620, 628 (S.D.N.Y. 2006); *Djuzo v. Commissioner of Soc. Sec.*, No. 5:13-cv-272 (GLS/ESH), 2014 WL 5823104, at *4 (N.D.N.Y Nov. 7, 2014) ("When a treating physician signs a report prepared by a nurse practitioner (an 'other source' whose opinions are not presumptively entitled to controlling weight), the report should be evaluated under the treating physician rule unless evidence indicates that the report does not reflect the doctor's views." (citing *Santiago*)); *Keith v. Astrue*, 553 F. Supp. 2d 291, 300 (W.D.N.Y. 2008) ("It was improper for the ALJ to discount office notes and reports signed by [treating physician] as being merely the opinions of [nurse practitioner]." (citing *Santiago*)).  In this case, the ALJ should have, at the very least, inquired into whether there was reason to believe that the Medical Source Statement filled out by Singer also represented the opinion of Dr. Polycarpe.  The ALJ did not, and instead elected to ignore completely the fact that Dr. Polycarpe had evidently reviewed and signed the Statement.  (*See* R. at 23 (referring to the document as "Singer's opinion"); *see also* Discussion, *supra*, at Section II(A)(2).)

In view of the entirety of the Record, the Court finds that the Medical Source Statement does, in fact, represent Dr. Polycarpe's opinion.  Not only is there no indication to the contrary, but the evidence in the Record shows that Dr. Polycarpe reviewed the Statement, and that Singer's selections on the form were in line with Dr. Polycarpe's views.  First, the treatment records reflect that Dr. Polycarpe and Singer worked in tandem to treat Plaintiff, and Dr. Polycarpe met with Plaintiff regularly.  (*See* Background, *supra*, at Section C(2)(a); *see also Keith*, 553 F. Supp. 2d at 301 (rejecting defendant's argument that physician's role was limited

30

to "approving medication"; record showed that physician "met with Plaintiff on numerous occasions, at which times he generally completed an assessment form, which included assessments of Plaintiff's mood and affect"); *cf. Camarata v. Colvin*, No. 6:14–cv–00578 (MAD/ATB), 2015 WL 4598811, at *15 (N.D.N.Y. July 29, 2015) (declining to attribute report completed by nurse to supervising physician where there was "no evidence of a doctor-patient relationship between Plaintiff and [physician]" and "[physician's] name [did] not appear in any of Plaintiff's treatment notes or medical records").)  Second, as the Court has noted, the Medical Source Statement not only contains Dr. Polycarpe's signature, but also a hand-written note clarifying one of Singer's responses on the form.  (*See* R. at 402; Background, *supra*, at Section C(2)(a).)  This shows that Dr. Polycarpe did not merely rubber-stamp Singer's conclusions, but rather that she reviewed the Statement.  Therefore, the Court finds that the ALJ should have attributed the opinions in the Medical Source Statement not only to Singer, but also to Dr. Polycarpe.

## 2.     <u>Dr. Polycarpe Was Plaintiff's Treating Physician.</u>

Dr. Polycarpe is the only medical source in the Record who treated Plaintiff during the relevant period.  (*See* Background, *supra*, at Section C(2)(a).)  Singer and Dr. Polycarpe treated Plaintiff for almost two years and, on average, saw Plaintiff more than twice a month.  (*See id.*)  Dr. Polycarpe personally saw Plaintiff nine times.  (*Id.*)  These visits were regular; they spanned the entire treatment period; and, at each appointment, Dr. Polycarpe conducted a mental status examination, recorded detailed notes, and managed Plaintiff's medications.  (*See id.*; *see also* R. at 402-506.)  This suffices to demonstrate that Dr. Polycarpe had an "ongoing treatment relationship" with Plaintiff, and that the length of that treatment relationship was sufficient for

the doctor to provide "a detailed, longitudinal picture" of Plaintiff's conditions.  20 C.F.R.

§§ 416.927(a)(2), (c)(2).

### 3. The ALJ Failed To Give Controlling Weight to Dr. Polycarpe's Opinion or To State Good Reasons For Not Doing So.

Having found that the Medical Source Statement completed by Singer represented

Dr. Polycarpe's opinion, and that Dr. Polycarpe qualified as Plaintiff's treating physician, the

Court finds that the ALJ violated the treating physician rule by failing to assign controlling

weight to Dr. Polycarpe's opinion or to articulate good reasons for declining to do so.

As discussed above, the ALJ assigned only "some weight" to the conclusions made in the

Medical Source Statement (which he labeled "Singer's opinion"), stating that those conclusions

did not "completely align with the preponderance of the evidence."  (*See* Discussion, *supra*,

at Section II(A)(2).)  As the opinion of a treating physician, however, the Medical Source

Statement should have been accorded controlling weight, absent expressly stated "good" reasons

by the ALJ for giving it less weight.  Here, the ALJ's vague, unsupported assertion that the

opinion did not *completely* align with the *preponderance* of the evidence is not a good reason.

Furthermore, before determining the weight to assign to Dr. Polycarpe's opinion, the ALJ was

required to consider the factors set out in 20 C.F.R. §§ 416.927(c)(2)-(5), and the ALJ's decision

does not reflect any such consideration.  Both of these defects in the ALJ's decision warrant

remand.  *See Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner

has not provided 'good reasons' for the weight given to a treating physician's opinion . . . .");

*Shaw*, 221 F.3d at 134 (the five factors "must be considered").

**B.    Without Proper Consideration of Dr. Polycarpe's
Opinion, the ALJ's Decision Cannot Be Found
To Have Been Supported by Substantial Evidence.**

In view of the fact that the ALJ failed to consider Dr. Polycarpe's opinion as required, the

Court cannot find that the ALJ's decision that Plaintiff was not disabled, either as a child or as an

adult, was supported by substantial evidence.  *See Sanchez v. Colvin*, No. 12cv6203 (CM)

(RLE), 2015 WL 4510031, at *17 (S.D.N.Y. June 1, 2015) (adopting report and

recommendation) (holding that ALJ's failure to give adequate consideration to treating

physicians' opinions resulted in an improper RFC determination that was not supported by

substantial evidence); *Martin v. Colvin*, No. 13cv2827 (VSB) (RLE), 2014 WL 4467709, at *16

(S.D.N.Y. Sept. 10, 2014) (adopting report and recommendation) (same).  This is both because

Dr. Polycarpe's opinion was material to several important aspects of the ALJ's disability

analysis, and because, in the absence of the medical evidence contained in her opinion (as well as

in her treatment notes), the other evidence cited in the ALJ's decision is insufficient to support

his ultimate determinations.

### 1.    Dr. Polycarpe's Opinion Was Material.

Singer and Dr. Polycarpe's Medical Source Statement contains assessments of Plaintiff's

functional capacity that are directly relevant to the ALJ's determinations regarding the extent of

Plaintiff's limitations, and that could have materially changed those determinations, had they

been properly considered.

For just one example, several aspects of Dr. Polycarpe's opinion, if credited under a

careful application of the treating physician rule, could have altered the ALJ's finding that, when

Plaintiff was a child, she had less-than-marked limitations in the domains of acquiring and using

information, attending and completing tasks, and caring for oneself.  (*See* Discussion, *supra*,

at Section II(A)(3).)  "Acquiring and using information" means "how well children perceive,

think about, remember, and use information" (*id.*), and, in the Medical Source Statement,

Dr. Polycarpe opined that Plaintiff had a "marked loss" in her ability to "[u]nderstand and

remember detailed instructions" (R. at 401). The domain of "attending and completing tasks"

involves "how well [a child] is able to begin, carry through, and finish activities, including the

mental pace at which she performs activities" (*see* Discussion, *supra*, at Section II(A)(3)), and

Dr. Polycarpe opined that Plaintiff had a marked loss in her ability to: "[p]erform at a consistent

pace"; "[c]omplete a normal workday or work week without interruptions"; and "[m]aintain

regular attendance" (R. at 401). And the domain of "caring for oneself" includes consideration

of "how well [a] child copes with stress and changes in environment" (*See* Discussion, *supra*,

at Section II(A)(3)), and Dr. Polycarpe opined that Plaintiff had a marked loss in her ability to

"[d]eal with stress or semi-skilled and skilled work" and an extreme loss in her ability to "[s]et

realistic goals or make plans independently of others" (R. at 401).

The ALJ's failure to abide by the treating physician rule may have similarly had a

material impact on his determination that Plaintiff was not disabled after she turned 18. For

example, Plaintiff's RFC, as determined by the ALJ, limits her to "simple, routine tasks with

occasional change in a routine setting and occasional interaction with the public, coworkers, and

supervisors." (*See* Discussion, *supra*, at Section II(B).) Yet the ALJ did not include any

limitations on Plaintiff's ability to attend work every day and to stay on task while at work

without an unacceptable number of breaks – two areas, among others, in which Dr. Polycarpe

opined that Plaintiff was limited by her mental impairments. As noted above, the Medical

Source Statement indicates that Plaintiff had a marked loss in her ability to: "[p]erform at a

consistent pace"; "[c]omplete a normal workday or work week without interruptions"; and

"[m]aintain regular attendance." (R. at 401.) The ALJ's decision does not reflect that the ALJ gave due consideration to these assessments.

The Court is not making any finding as to whether there may actually be good reasons in the Record for not giving controlling weight to Dr. Polycarpe's opinion, but, if the ALJ finds that such reasons exist, he must set them out, after appropriate consideration of the relevant factors. Further, the Court is not making any determination that Dr. Polycarpe's opinion, if accorded greater deference under the treating physician rule, would necessarily render the ALJ's RFC determination erroneous. Nonetheless, especially as the VEs, together, testified that missing two or three days of work each month or being off-task 25 percent of the time would be "work preclusive" for an individual with Plaintiff's other limitations (*see* Background, *supra*, at Section E), the ALJ must at least consider the assessments by Dr. Polycarpe that bear directly on these issues, and, to the extent the ALJ determines that such assessments should be discounted, he should set out a reasoned explanation for discounting them.

Upon remand, the ALJ should consider all aspects of Singer and Dr. Polycarpe's Medical Source Statement that might be relevant to Plaintiff's ability to work, not just those portions highlighted above.

### 2. The ALJ's Finding That Plaintiff Was Not Disabled as a Child Was Not Otherwise Supported by Substantial Evidence.

On the question of whether there was substantial evidence in the Record to support the ALJ's determination of Plaintiff's RFC as an adult, the Court limits its holdings to those set out above. While the ALJ's evaluation of Plaintiff's RFC was deficient because of his failure to give due consideration to the opinion of Dr. Polycarpe, the Court finds no obvious error in other aspects of the ALJ's RFC analysis (although, upon remand, the ALJ should revisit that analysis, in its entirety, in view of Dr. Polycarpe's opinion).

As to the ALJ's determination of Plaintiff's functional capacity as a child, however, the ALJ's decision reveals additional flaws that warrant mention, resulting from his particularly heavy reliance on non-medical evidence, drawn mostly from Plaintiff's school records, to justify his findings. Even to the extent it was appropriate for the ALJ to rely on Plaintiff's school records, he ignored much of the most probative aspects of those records in favor of other, seemingly inapposite aspects.

For example, in determining that Plaintiff had a less-than-marked limitation in the domain of attending and completing tasks, the ALJ explained, as noted above, that Plaintiff "was able to work on the one-step scientific equation questions in class[] and [ ] was capable of understanding the science content . . . if she was present for the lesson" and that she "liked to go up to the board and participate." (R. at 25.) It is difficult to understand how these narrow and seemingly random anecdotes from Plaintiff's IEPs indicate that Plaintiff did not have a marked limitation in attending and completing tasks. The fact that Plaintiff was seen as capable of understanding certain content and working on certain questions posed in one class may shed some light on whether she had the intellectual capacity to perform particular tasks, but it says little about Plaintiff ability to "begin, carry through, and finish" tasks and to do so at a consistent pace. (*See id.* (citing 20 C.F.R. § 416.926a(h) and SSR 09-4p).) Moreover, Plaintiff's educational record is replete with examples of her *not* being able to complete tasks and stay engaged in what she was doing. (*See* Background, *supra*, at Section C(1).) For instance, Hatzis opined that, in the domain of attending and completing tasks, Plaintiff had a "very serious problem" with "[f]ocusing long enough to finish [an] assigned activity or task" and with "[w]orking at [a] reasonable pace/finishing on time." (R. at 274.) The ALJ assigned "great

weight" to Hatzis's opinion, yet inexplicably ignored it, even when it explicitly commented on the functional domain that the ALJ was considering.

The evidence cited by the ALJ in the two other relevant domains was similarly deficient. In the domain of acquiring and using information, the ALJ pointed to Hatzis's statement that Plaintiff "had not grown in her independence" and that she "would immediately ask for help and[,] when it was not given, [ ] refuse[] to try on her own." (*See id.* at 24.) The ALJ also described reports that Plaintiff would not accept support when offered, and "would then claim that she was not being helped or supported enough." (*Id*. at 25; *see also* Discussion, *infra*, at Section II(A)(3).) Essentially, the ALJ concluded from these reports that Plaintiff was unwilling to make efforts or to accept assistance when offered – but, even if these characterizations were accurate, it is difficult to see how they could have led the ALJ to make a determination regarding the extent of Plaintiff's actual ability to "perceive, think about, remember, and use information." (R. at 24 (citing 20 C.F.R. § 416.926a(g) and SSR 09-3p).)

In the domain of caring for oneself, the only purportedly supportive evidence cited by the ALJ in determining "how well [Plaintiff] maintain[ed] a healthy physical and emotional state . . . [and] cope[d] with stress" was that, when Plaintiff was asked to lead a group in a dance class, she did not exhibit the types of frustrated and angry behaviors she normally exhibited. (*See id.* at 26-27.) Yet the fact that Plaintiff, at one particular time and in one particular context, seemed able to overcome the symptoms of her impairments does not amount to substantial evidence that Plaintiff was not otherwise markedly limited in her ability to care for herself, particularly given the other evidence cited by the ALJ in this same portion of his decision, as discussed above. (*See* Discussion, *supra*, at Section II(A)(3).)

Finally, the Court notes that, despite stating that he was giving "significant weight" to the opinion of Dr. Kim, the ALJ did not once cite that opinion in his discussion of the three relevant domains of childhood functioning, making that discussion entirely devoid of medical evidence. (*See* R. at 24-27.)[14]

In sum, separate and apart from the ALJ's failure to consider the opinion of Dr. Polycarpe properly under the treating physician rule, the facts cited by the ALJ in support of his determination that Plaintiff was not disabled as a child cannot be found to constitute substantial evidence.

## **CONCLUSION**

For all of the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Dkt. 17) is granted, and Defendant's cross-motion for judgment on the pleadings (Dkt. 19) is denied.

This case is hereby remanded for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).  Upon remand, the ALJ is directed as follows:

(1)     With respect to the Medical Source Statement completed by Singer and co-signed by Dr. Polycarpe:

(a)     to treat the Statement as representing the opinion of Dr. Polycarpe;

(b)     to consider Dr. Polycarpe to have been Plaintiff's treating physician;

---

[14] In any event, Dr. Kim's opinion, which stated that Plaintiff had very few limitations and none that were more than moderate, is seemingly in tension with the opinion of Dr. Polycarpe, which assessed more serious limitations.  (*See* Background, *supra*, at Section C(2).)  Before determining how much weight to assign to Dr. Kim's opinion, the ALJ should have first considered whether Dr. Polycarpe's opinion was entitled to controlling weight, or at least to more weight than Dr. Kim's opinion.  *See* SSR 96-2p ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").

      (c)     to give Dr. Polycarpe's opinion controlling weight, or articulate good reasons for not doing so, in accordance with the treating physician rule; and

      (d)     to reconsider his determinations regarding Plaintiff's functional capacity (as both a child and an adult) in light of Dr. Polycarpe's opinion; and

  (2)     With respect, in particular, to the determination of Plaintiff's functional capacity as a child, to revise his analysis by considering all relevant evidence from both medical and educational sources, as discussed in this Memorandum and Order.

In light of this Order, the Clerk of Court is directed to close Dkts. 17 and 19 on the

Docket of this action, and to enter judgment in Plaintiff's favor, directing remand.

Dated:  New York, New York
      March 27, 2020

SO ORDERED

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

All counsel (via ECF)